MEMORANDUM OF DECISION
On June 25, 1998, the Department of Children and Families, hereafter "DCF", filed petitions for the termination of the parental rights of Tamika W. and Vincent P. to their three children, Vincent[2], Paul and Dashawn. DCF became involved with the children on December 13, 1996, when all three children were found on the streets of Hartford with inadequate clothing and without adult supervision. They were then in the care of their paternal grandmother who had left them with an inappropriate care provider. Their mother was living in another home and their father was incarcerated. They were then five, four and three years old respectively.
On May 17, 1997, all three children were adjudicated neglected and committed to the care and custody of DCF. Their commitments have been extended once since that date. The termination petitions allege that the children had been abandoned by their parents and that their parents had failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the children, they could assume a responsible position in their lives. The last allegation is that there is no ongoing-parent-child relationship and that allowing further time for the establishment of a relationship would be detrimental to the best interests of the child. Connecticut General Statutes § 17a-112(c)(3)(A), (B) and (D). Trial on the petitions commenced and ended on February 22, 1999. Neither parent attended the trial. Vincent P. was represented by counsel. A guardian ad litem had previously been appointed for Tamika. His role was to contact her and advise her to seek counsel, which actions he was able to complete. Tamika, however, never followed his suggestion, did not secure counsel and was not represented at trial. For the reasons set forth below, the court grants the termination petitions.
From the evidence presented, the court finds the following facts: CT Page 2451
 A. FACTS
Tamika W., now age twenty-one, had a troubled relationship with her own parents and she was living on her own at age fourteen. At that time, she moved into the home of Sheila P., the children's paternal grandmother. Tamika gave birth to her first child, Vincent, Jr., with Vincent when she was only fourteen. The second child, Paul, was born when Tamika was fifteen and the third, Dasnawn, when she was sixteen. She and Vincent were never married and Vincent was himself only eighteen when their oldest child was born. She and Vincent had a troubled relationship, marred by domestic violence for which Vincent was arrested. The children appear to have been largely cared for by their paternal grandmother. In 1994, after the birth of Dashawn, Tamika moved out of the home in which they had all resided, leaving the children with their grandmother. Tamika apparently visited them from time to time, but no one took any steps to legally regularize the children's status in their grandmother's care. Vincent was also not involved with the care of the children.
Tamika did not complete high school, leaving after the ninth grade. She has never been employed and reported to the DCF social worker and Dr. Robert Meier, the court-appointed psychologist evaluator, that she received a serious injury to her left arm while in a fight with another woman in 1994. Her ability to use her left hand is quite limited. After the removal of the children from Sheila P., Tamika was referred by DCF to various services which included counseling at Catholic Family Services, the Village for Children and Families and at East Hartford Youth Services. She was unwilling to accept any services and has not met the expectations which were set for her by the court on May 16, 1997. She has had regular visitation with her children since their removal. However, that visitation became less and less frequent and in 1998 Tamika only visited with them a total of four times. Her last visit took place on July 29, 1998 and she has not seen any of her children since that time. The DCF social worker assigned to the case testified that during the one visit she herself supervised, Tamika did not interact with her children at all, laid her head on a table and spoke of how sick she was feeling then.
Dr. Meier, who evaluated her on April 30, 1997, found in his report[3] that Tamika showed "little insight into the concerns about her care for her children, takes little or no CT Page 2452 responsibility for the neglect of the children and seems to have no awareness of what needs to be done to correct the situation." He found that Tamika "does not have the self-control, comprehension of the children's needs, judgment or skills to provide a suitable home for these children." He believed Tamika should be given a reasonable period of time to demonstrate her willingness to parent the children, concluding that a one year period was appropriate. If she was not able to demonstrate such an ability, he recommended that thereafter a plan for permanency should be considered.
Vincent P., the father, was not evaluated by Dr. Meier as he was incarcerated at the time the evaluation was performed. In March of 1995, he was incarcerated after he violated the terms of his probation and remained incarcerated until July, 1998, when he was discharged. He arranged for one visit with the children while incarcerated. That visit took place in February, 1998 and he did not request additional time with the children until after his release. While incarcerated, he completed certain programs available to him, which included individual counseling, drug abuse rehabilitation, anger management and gang awareness. His prison counselor testified that he did not seek her assistance except for the one visitation session and did not ask for help in contacting DCF or the foster parents to learn about his children.
The DFC social worker testified that since Vincent's release from prison, he has visited with his children. She stated that during his first visit on July 29, 1998, he spent the entire time talking to her about getting a job and his other plans. He did not focus on the children and she had to repeatedly tell him that the visitation session was not the time nor the place to discuss his situation. She stated that he did not request additional reunification services, ask for help concerning parenting or about how to make a home for the children. He did not request information about their well-being or their status in their various foster homes. She stated that he has visited with the children a total of five or six times since his release. His visits, in her opinion, appeared to be more an accommodation to his mother to make her visits possible than based on any genuine desire on his part to spend time with his children.
There were no specific referrals by DCF to various services for Vincent P., in part because on April 30, 1998, the court had determined that further reunification efforts for both parents were no longer appropriate. (McLachlan, J.) There were also no CT Page 2453 expectations set for Vincent and in general, he has taken few steps to demonstrate concern or involvement with his children. His unexplained failure to attend the trial, during which his counsel vigorously contested DFC's allegations, is another demonstration of his lack of interest in parenting his children.
The children, in the meantime, have not had an easy time in foster care. Vincent, Jr., the oldest, now age seven and four months, had seven different placements prior to his current placement, where he is thriving. His therapist from the Village for Families and Children testified that he has made great strides in the past nine months. He is a child who needs structure and does not tolerate change well, all things his present foster mother has worked hard to provide for him. He does not mention his mother. Before his first visit with his father in July of 1998, he was quite excited and interested in him. Lately, she stated that he does not talk about his father. He continues to express a great desire to visit with his paternal grandmother and his siblings and when such visits are disrupted for whatever reason, he begins to act out in the ways that he had in the past. She stated that because he was a "parentified" child, feeling responsible for his younger siblings, she was not sure that the two younger children should be placed in the same home with him. She stated that if this step were taken, a very accomplished foster parent would be required. She also believed that Vincent's present foster mother was able to handle such a task, provided there were supportive services in place to assist her.
His therapist spoke of the significant problems that Vincent, Jr. has had in the past. He suffered from nightmares, sleep disturbances, anxiety, aggressive behavior in school and in his previous foster homes. His therapist stated that it took him a great deal of time to become comfortable in his environment and that it was hard for him to trust people. Because of his behavioral problems, Vincent, Jr. received special education, but since his improvement he is in the process of being returned to a regular school classroom. The social worker testified to many of the same facts, stating that Vincent, Jr. never mentioned his parents to her. She, too, noted his bond to his paternal grandmother and the success he has had in his current foster home placement.
The second oldest boy, Paul, is not doing as well as Vincent, Jr. He is presently experiencing many of the same difficulties that led to Vincent's brief psychiatric hospitalization in 1998. CT Page 2454 Paul is in a sub-acute unit at the Boys Village in Milford, because he could not be maintained in his foster home. Paul is now six years and four months old. Because of his out-of-control behaviors, he was suspended from school, where he had been in special education classes. At the Boy's Village, he is being seen by a psychiatrist to assess his medications. Once Paul has stabilized, the permanency plan for him is to be in a specialized foster home, perhaps the home in which Vincent has been placed and for him to be adopted.
The youngest child, Dashawn, is now five years and five months old. He has done well in his present foster home and is attached to his foster mother. He receives speech and language assistance and is in a special education class at school. Despite his progress in his foster home, the foster parents do not wish to provide an adoptive home for him,
The DCF social worker testified that even though the paternal grandmother, Sheila P., was not being considered as a person with whom the children could be placed, DCF was committed to allowing the children sustained contact with her, based on the bond all of them had with her. Specifically, DCF believes visitation should continue up until the time of any adoption and the adoptive parents would be encouraged to consider contact in the future. The social worker believes, as does Vincent Jr.'s therapist, that such contact is in the children's best interest.
Another possible placement resource is a collateral family member, the children's great aunt by marriage. The social worker testified that if the parents' rights to these children are terminated, then the case will be transferred to a permanency planning worker who will consider the various options available. She stated that DCF was also continuing to consider placement of all three children with Vincent Jr.'s foster mother, who had expressed an interest in adopting Vincent, Jr.
 B. ADJUDICATION 1. Reasonable Reunification Efforts
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification CT Page 2455 efforts, provided that such a finding is not required if the court has determined at a hearing pursuant to Connecticut General Statutes § 17a-110(b) that such efforts are not appropriate." Connecticut General statutes § 17a-1 12(c)(1). As previously found, at a hearing conducted on April 30, 1998, the court found that reunification efforts for both parents were not appropriate. The court therefore holds that the predicate finding required by the statute has been made and that it can now consider the facts concerning adjudication.
2. Adjudicatory Findings
The court finds, by clear and convincing evidence, that as of June 24, 1998, both Tamika W. and Vincent P. had abandoned their three sons. "Abandonment occurs where a parent fails visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." In re Juvenile Appeal(Docket No. 9489), 183 Conn. 11, 14, 438 A.2d 801 (1981). Tamika appears never to have acted as a functioning parent for the boys. She failed to visit them regularly, and when she did visit, she did not know how to interact with them as a parent. Vincent P., their father, has exhibited only sporadic interest in his sons. Both parents' abandonment of the children has existed for more than a year prior to the filing of the termination petition.
The court further finds, by clear and convincing evidence, that as of June 24, 1998, neither parent had achieved such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the children, they could assume a responsible position in their lives. Connecticut General Statutes § 17a-112(c)(3)(B). Tamika has refused all services that were offered to her. She did not meet any of the expectations of the court established for her on May 15, 1997. (Santos, J.) Dr. Meier recommended in 1997 that she be given one year to demonstrate her interests and willingness to parent her children. She did not do so and, by June, 1998, had visited with even less frequency than in the previous year. The court concludes that she was not rehabilitated as a parent and that giving her more time, when she has not demonstrated any increasing ability to function in a parental role, would serve no purpose.
Vincent, by the adjudicatory date of June 24, 1998, had not yet been released from incarceration. He, however, had done CT Page 2456 little to demonstrate and maintain his contact and interest in the children. He had only requested one visitation session with his children while incarcerated. He had not shown any interest in the children's specialized needs and requirements. He had not taken a parenting class. He had not requested any administrative case reviews, which would have been provided to him while incarcerated. The court concludes that he had done little, if anything, rehabilitate as a parent. Further, what little he did do was woefully short of what his children would require. Giving him more time under the circumstances as they existed then and even now would serve no purpose.
"`Personal rehabilitation' as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Migdalia M., 6 Conn. App. 194,211, 504 A.2d 532 (1996), see also; In re Juvenile Appeal,1 Conn. App. 463, 477, 473 A.2d 795 (1984). There is no doubt that neither Tamika nor Vincent will be rehabilitated within the foreseeable future. The court finds, based on the clear and convincing evidence, this ground had existed for longer than one year prior to the filing of the termination petitions.
The last ground alleged is that there is no ongoing parent child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child; Connecticut General Statutes § 17a-112(c)(3)(D). "The court must first make a determination that no parent-child relationship exists and then, if that is so, it must determine if, in the future, the child's best interest would not be served by allowing time for the establishment or reestablishment of the relationship. " In reMigdalia M., supra, page 211; In re Juvenile Appeal (84-3),1 Conn. App. 463, 473 A.2d 795 (1984); In re Juvenile Appeal(Anonymous), 177 Conn. 648, 420 A.2d 875 (1979).
The court concludes, from the clear and convincing evidence, that neither Tamika nor Vincent had a parent-child relationship with any of their three children. Providing them further time to develop such a relationship is not in the children's best interests, as all three children require a permanent home and neither parent has demonstrated any progress toward developing a parent-child relationship or understanding the needs of these CT Page 2457 three boys.
 C. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112(e):
1) Appropriate and timely services were provided by DCF to the family. Those services were services to benefit the children, referrals for individual counseling for Tamika W. as previously described, case work services and visitation coordination and transportation.
2) The court need not find by clear and convincing evidence that DCF made reasonable efforts to reunify the family, as the court at a previous hearing determined that reunification efforts were no longer appropriate. Nonetheless, given the situation and circumstances, as it existed prior to that hearing, the court finds that DCF made reasonable efforts, which Tamika refused. Vincent P., during the time in question was incarcerated and did not take advantage of what services DCF could have offered him, which included monthly visitation and biennial case reviews of the plans for the children.
3) The terms of applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations. The court finds that Tamika did not minimally fulfill the court expectations set for her on May 15, 1997. The court finds the expectations set for Tamika to have been reasonable. No expectations were set for Vincent as he did not participate in the court proceedings.
4) The feelings and emotional ties of the children with respect to the parent, any guardian of the person and any person who has exercised physical care, custody and control of the children for at least one year and with whom the children have developed significant emotional ties. The children unfortunately have had multiple caretakers, but now Vincent, Jr. and Dashawn appear connected to their present foster parents. The children display no interest in their mother and only Vincent. Jr. some time ago was interested in visiting with his father. All of the children are bonded to each other and attached to their paternal grandmother, Sheila P., who provided most of their daily care prior to their removal from her care in December of 1996. CT Page 2458
5) Finding regarding the ages of the children. Vincent, Jr. is seven years and four months old. Paul is six years and four months old. Dashawn is five years and five months old.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the children to return them to their home in the foreseeable future and (A) the extent to which the parent has maintained contact with the children as part of an effort to reunite the children with the parents, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the children. As detailed above, the court finds that neither Tamika nor Vincent have made any changes in their lives to accommodate the care and nurturing of these three children. They have never begun to rehabilitate from the problems and failures which led to the removal of the children.
7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with the children by the unreasonable act or conduct of the other parent of the children, or the unreasonable act of any other person or by the economic circumstances of the parent. No such conduct is noted. DCF has taken steps to encourage these parents to have a meaningful relationship with the children and to rehabilitate themselves. which they have been unable to accomplish.
 D. DISPOSITION
Vincent, Jr., Paul and Dashawn have been in foster care for over two years. They are in need of a permanent placement. Their parents are no closer now to making the necessary personal changes to parent them than they were when the boys were removed from their care in 1996 The boys retain a close sibling bond and have a connection to their present caretakers. The court acknowledges the "deleterious effect of prolonged temporary care of abused and neglected children." In re Juvenile Appeal (84-CD),189 Conn. 276, 455 A.2d 1313 (1983). The Appellate Court has noted, "[because of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In re Alexander V., 25 (Conn.App. 741, 748,596 A.2d 930 (1992).
Based upon the foregoing findings, the court finds that it is CT Page 2459 in the best interests of the children that the rights of their biological parents to them be terminated. The court orders that a termination of parental rights enter with respect to Tamika W and Vincent P. as to their three children, Vincent, Jr., Paul and Dashawn. The Commissioner of the Department of Children and Families is hereby appointed the children's statutory parent. Given DCF's determination that there is a bond between the children and their paternal grandmother, Sheila P., the court directs that DCF continue to consider the benefits of contact between the children and their grandmother. Further, the court directs that Vincent, Jr.'s foster mother, who has expressed a willingness to adopt this child, be given first consideration in such adoption. The court also approves of the DCF plan to encourage any adoptive parties to favorably consider ongoing contact between the children and their paternal grandmother, understanding that such visitation would be at such adoptive parents' election. Nonetheless, it is clear from the testimony that such contact is in the children's best interests and that it has helped to stabilize them during the difficult transitions in their young lives. The court further orders that a permanency plan for Vincent, Jr., Paul and Dashawn be submitted within ninety days. A review plan for them shall be filed in accordance with state and federal law.
Barbara M. Quinn, Judge Child Protection Session